from the District of North Dakota, United States v. Walter Cartwright, III. Good morning, Your Honors. May it please the Court. The District Court abused its discretion, dismissing the indictment without prejudice. The dismissal, which is not in dispute, was a violation of Cartwright's anti-shuttling rights under Article IV-E of the IADA. The IADA requires dismissal of an indictment where a defendant, like Cartwright, was transported back to a sending state from a receiving state. In most cases, the agreement requires dismissal with prejudice. The exception is for when the receiving state is the United States, which is the case here. In cases where the United States is the receiving state, a district court may dismiss with or without prejudice. The agreement also gives the Court factors to consider. Those three factors are the seriousness of the offense, the facts and circumstances that led to dismissal, and the impact of re-prosecution on the administration of the IADA and the administration of justice. The district court here abused its discretion in considering those factors and starting with, third, the impact of re-prosecution. Here, the district court improperly considered an irrelevant factor, prosecutorial bad faith, or as it characterized it as well, prosecutorial misconduct. We are not alleging that there was any sort of prosecutorial misconduct that resulted. That's within the list of factors in prior cases, isn't it? That appears in certain cases, and I would like to distinguish the issue here. In the Eighth Circuit cases, I mean, didn't we basically tell the district court that here's some of the things that you should consider? And bad faith has to be one of them. There are. So you're saying it was error for the court to write an opinion that say, I covered the Eighth Circuit factors and as to bad faith, there was none? Your Honor, I see two. Is that reversible error? I see two. I see two cases. There's the McComber case as well as the McKinney case. The McKinney case deals with not the anti-shuttling provision, but with the speedy trial. Reversible error just because he mentioned bad faith in his opinion? It's going to be a combination of factors that the court considered improperly. That is our position. And I'm starting with the — Fine. But what makes it improper to consider, because you didn't allege it? Well, I didn't allege it because there was nothing to allege. There was no prosecutorial misconduct. But this is an anti-shuttling violation that says that if an inmate is transported back to a sending state before trial — Was McKinney an IADA case? It was, but that deals with the speedy trial right violation. I believe McKinney dealt with that. And that's my distinction here. When we're dealing with the Speedy Trial Act violation, prosecutorial misconduct or bad faith is certainly a relevant factor. I'm not disputing that. That's because in a case that's setting a trial for a certain period of time, certainly a prosecutor could have a say in how that case is prosecuted and when, and could lead to improper extensions in violation of the Speedy Trial Act, just like under the Speedy Trial Act under 3162, Title 18. It's different with anti-shuttling, because the U.S. Attorney's Office is never going to act in bad faith because the U.S. Attorney's Office doesn't shuttle prisoners. The U.S. Marshals — Well, it's the bad faith of the person that made the mistake. Right. And that's irrelevant? That's not irrelevant. It's the Marshals' service bad faith. Right. And you said, in fact, the U.S. Marshals negligently returned Cartwright. Right. So you say negligence off the bat, so — Right. Negligence. And I'd go so far as to say it was blatant and obvious. And that deals with kind of the second factor is the facts and circumstances that led to the violation. But we're talking about the administration of justice, and the U.S. Marshals are involved as an agent of the court in the administration of justice. So tell me where that's going? Yes. Because it's not just the administration of justice. It's the administration of the IADA. And the IADA serves to — I thought we, in our cases, had used the term administration of justice, not to be legalistic with you. But haven't we used that term? That is the term, and that is the language that is used in the act, but also the agreement. Excuse me. The agreement under Section 9, which carves out the exception for the United States. Administration of justice is a broad term. Yes. But to exclude the administration of the IADA and its purposes and aims. And that's thoroughly discussed in the district court's opinion that was cited, United States v. Maryland. A factually distinguishable case, but I think it's important in its discussion in how we deal with the administration of the IADA. You mentioned — you said Maryland, right? I heard you say Maryland, District Court of Maryland. Yes. Okay, great. Because my real question was, is McKinney and maybe McComber, are these the only cases we've got on this? That's my understanding. Yes. Those are the two I would like to — Thank you. So there's not a whole lot of guidance on here, and that's, I guess, one of the purposes and aims I'm trying to — Of course, it may be very good guidance. Proceed. Well, again, it's the anti-shuttling component of it. The prosecutorial bad faith is what the district court stated. It didn't say government bad faith. It said prosecutorial bad faith. But that's an impossible standard under the anti-shuttling violations. If that were the case, then there was never going to be a situation where a defendant is going to have his indictment dismissed with prejudice where his anti-shuttling rights were violated. And that's exactly what happened here. Turning to the factor of the facts and circumstances of the case, I believe that the district court abused its discretion in not considering the nature of this violation. The court seemed to impose a burden on Cartwright to prove certain things, including the prosecutorial bad faith, but also as to a pattern of negligence or a pattern of misconduct when dealing with the facts and circumstances that led to dismissal. The facts and circumstances that led to dismissal were one transfer, but that one transfer was significant. Cartwright, at many stages during this case, made it known that he wanted to fully assert all of his rights under the IADA, including the anti-shuttling provision. He wasn't moved for that arraignment, was he? It was all remote? It was a remote. He was in state custody. He was in state custody. Yes. He wasn't brought to a federal courthouse. So there was no place physically to take him back. To be clear, he was in... They had to affirmatively take him somewhere from where he was federally arraigned in order to comply with this IADA. Yes. And what we have in our... That nature of that violation is, I'm not even sure it's negligence. I mean, it's inadvertence. I don't believe so. There was a district... The magistrate court issued an order of detention that clearly said Cartwright does not waive his IADA, his IADA anti-shuttling. Is the marshal even with him at that point? It directs the U.S. marshal to keep him in federal custody, so it flies in the face of that order. But physically, who was where? Did the marshal then have to drive hundreds of miles to get him and bring him back to federal custody? Either the marshal or his agent. I don't know if that was through a local agency at the marshal's direction. I don't know exactly. But yes, the marshal's transported Mr. Cartwright from federal custody to state custody. No, wait a minute. You just said he was in state custody for the arraignment. Right, I misspoke. But he didn't move afterward. He was in a state facility on a federal hold. He was in federal custody at that point on a federal arrest warrant. Well, the state facility was where he was incarcerated under state law? It was not. He was in a county jail, in the Ward County Jail in Minot, North Dakota. He was serving a North Dakota State prison sentence where he, I think, was spending most of his time and where I believe he remains now at the North Dakota State Penitentiary in Bismarck. And where was the magistrate judge? At the time he issued the order? Bismarck, Your Honor. I will reserve my remaining time, if I may, for rebuttal. May it please the Court. My name is Jeremy Ensrud, here on behalf of the District of North Dakota. Mr. Belmore earlier outlined what this case is about. There is no doubt that there was a violation of the Interstate Agreement on Detainers Act and when we look at the District Court's opinion on that, we look at abuse of discretion and we look at the factual findings that supported the decision for clear error. As earlier mentioned, there are the three factors that the Court looks at, both the seriousness of the offense, the facts and circumstances leading to the dismissal, and the impact of re-prosecution on the administration of the Act. When we look at what happened here, he was being held in Ward County Jail in state custody. He made the appearance and should have remained in federal custody. From there, he's transferred to the State Penitentiary. So when we look at the violation here, there was some talk when Mr. Belmore was up here, was it significant? I don't mean to make light of the fact that there was a violation and it should have been dismissed, but we're not looking at a transfer from the State of North Dakota back to Florida or something else. We're looking at a defendant that was in state custody in Minot, North Dakota, who was inadvertently, due to oversight, transferred down to Bismarck, North Dakota, approximately 100 miles down the road, where the federal court actually is, where the U.S. Attorney's Office is. So when we look at the significance of it, it's not that I don't believe that there was some great impact. The defendant here is not mentioned in the agreement? It is not, Your Honor. Okay. What factor does it go to, the factors that district court is supposed to look at? I think that would go towards the significance of what happened here as far as the second factor. We don't describe them that way, do we? And the law doesn't describe them that way. Which of the three in the law or our cases are you talking about? I would look at the facts and circumstances leading to the dismissals, what I would look at for that. But the other thing I'd like to clarify as far as that facts and dismissals was in the reply, the appellant said that it made it look like we were making the argument that the marshals are overburdened and that this was some excusable error. That was not the purpose behind the United States, including those numbers as far as the number of defendants that are held, the number that are transferred. I don't hear an answer to Judge Benton's question. I'm sorry. Well, it was simple. Where does it fit? Where does all this fit as to the arguments you're making? Where do they fit in what we tell them to do? I believe looking at the facts and circumstances leading to the dismissal, the second factor. Proceed. So looking at that, under that factor, we have a large number of transfers that happen. And over the course of this marshal that submitted the affidavit to the Court, it had only happened once before through all of these transfers. So there is no pattern of misconduct here. That's not in the law either, right? The law doesn't talk about pattern. I realize you're going to say facts and circumstances. I think it also would go to when we look at the bad faith that was mentioned earlier. It's not that there is some habit of this being done or something, that there's some bad faith that we just, as the appellant puts in there, that if we don't dismiss with prejudice, it encourages the United States to just, you know, continue to do this along with the marshals. Well, I think, one, if we continue to do it, I think the district court would take full of prejudice at some point. So that's all I'd like to mention for that. As to the seriousness of the offense, the first factor, I think this is pretty clearly a serious offense. When we look at the Eighth Circuit's earlier decisions, we have McKinney along with Durancell that both have, are on point as far as we have a, in Durancell, a 10-year imprisonment and a fine of $250,000. It's the same thing we have here. When we look at the underlying facts here, we have a felon who is in possession of an Uzi firearm, who is driving a stolen vehicle with a suspended license, and he was, by his own admission, going to trade that firearm for drugs. When we look at the interstate transportation of stolen property, I think that's certainly a smaller offense than what we're dealing with here. Getting back to the facts and circumstances, again, this was an inadvertent transfer. It was miscommunication and oversight, and that's certainly unfortunate, but it is not anything more than at most negligent. Also looking at the United States' actions here, I appreciate that Mr. Belmore says that we could never act in bad faith. I hope that is the case, but certainly there could be cases of bad faith. But that factor weighs in favor of dismissal without prejudice. Finally, we have the impact of reprosecution. As the Court notes in its opinion at page 8 of the addendum, since the sanction of dismissal with prejudice serves to prevent prosecutorial abuse, it would not offend the purposes of the IADA to dismiss without prejudice where the prosecution played no role in the violations. And then finally, as far as the kind of broad statement of administration of justice, I agree with the Court's opinion that allowing the defendant to escape potential liability on a technical violation does not further aid the administration of justice. And that's what we have here. We have a technical violation where the remedy that the appellant is asking for would allow the defendant to escape his punishment because of a technical violation. Well, I didn't. This impact of reprosecution discussion by the district court, did the defendant argue how his defense would be prejudiced at a second trial because of timing or some other factor, or just the IADA integrity required dismissal? I think there's quite a bit of discussion about this intake that he had something with the parole board and with his treatment at the state penitentiary and how that But that's irrelevant. I would agree, Your Honor. But why doesn't the district court talk about it? Well, and this access to counsel was interfered with, but was there any argument that the interference with the past interference with access would prejudice the defense in a new trial? Was there an argument? It was not, Your Honor, that I'm aware of. It seems to me that's the impact. That's the kind of impact that I would look for in these cases, that sometimes witnesses die or who knows what else can happen. And it's very unfair. It makes it unfair to the defendant to have to do it now instead of before. And certainly that's always a factor when these cases get drug out for years, that officers retire, people pass away, you can't find people later on. But there was no argument as to that being a relevant factor here, Your Honor. If there are no other questions, I thank the court for their time. Thank you. For rebuttal, Mr. Gilmour. Thank you. The factor I did not get to before was the seriousness of the offense. The one thing I wanted to mention was what the district court relied on in making its decision here. And that was Mr. Cartwright's criminal history, which I think, if relevant, is of very little use, but particularly here. Counsel, the district court's bottom line was not that, but the statutory maximum. Well, the statute. The district court has said you all disagree about the range into this and that. But look at the statutory maximum right that the district court said. This Court has never said there's a per se. Ten years is a serious offense. That factors against a defendant. I know that there's been several cases that have done that. In the Duranso case, the government points out, involving a property case, involved $60,000 lost to a victim that ended up closing a 43-year-old-run business. That, I think, is far serious than a case here that has to do with a broken-down gun. That they'll meet the definition, Federal definition, of a firearm was inoperable in the sense that it was missing parts. And that was before the Court. But the criminal history the Court relied on was criminal history that occurred after this case. This wasn't prosecuted. There was a delay in the prosecution of this case by the United States. In the meantime, Mr. Cartwright accumulated some criminal history, and the Court relied on that to factor in the seriousness of this offense, which, I argue, was improper. And, again, another Even if it would be a relevant conduct in the sentencing after re-prosecution? You can see my clock is winding down. If I may answer that, Your Honor. Oh, sure. The district court, another Eighth Circuit court case was Ward. That was an unpublished decision. Yes. Okay. The district court relied on that and cited on that to say, well, the criminal history could impact that. It could increase a sentence. But what Ward was referring to was a firearm case, but it was referring to the potential for the defendant in Ward to be deemed an armed career criminal, which would increase his penalty by statute. Going from 0 to 10 years under 924C to 15-year minimum up to a life sentence under 924E. So the Court's reliance on the criminal history impacting a state sentence, a potential sentence, is misplaced. And I think the Court overstated, over-considered, and improperly considered Mr. Cartwright's criminal history in weighing the seriousness of the offense. So I'd ask that the district court's order be reversed and sent back to the district court for further proceeding. Thank you. Thank you, counsel. The case has been well briefed and argued, and we'll take it under advisement.